IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

        v.          :          CRIMINAL NO. 25-248

DOMINIQUE R. DUNSTON          :

### GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Dominique Dunston tried to defraud the federal government of pandemic loan funds for a non-existent business and participated with others in a conspiracy to launder the proceeds of a large-scale wire fraud scheme that stole hundreds of thousands of dollars from the federal government. Dunston committed numerous acts in furtherance of the fraud scheme and money laundering conspiracy, including opening bank accounts for a business she knew was not operational, conducting financial transactions with funds she knew were derived from crime, and lying to bank employees when her accounts were frozen. The defendant's participation was essential to the conspiracy. It could not have succeeded to the extent that it did without her willingness, and the willingness of others like her, to move the money around in order to conceal its unlawful source, its location, and the identity of the person who was directing its movement. For her participation in the money laundering conspiracy, the defendant personally profited in an amount totaling tens of thousands of dollars. For these reasons, as well as for the reasons provided below and in the sealed supplement to this memorandum, the government recommends a sentence within the Sentencing Guidelines range of 37 to 46 months of incarceration.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025). At the

second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors.

## I.   **BACKGROUND**

On January 9, 2026, the defendant pled guilty to all eight counts in the indictment, including one count of wire fraud in violation of 18 U.S.C. § 1343, one count of conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h), and six counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). During her guilty plea colloquy, the defendant admitted that from May to August 2020, she conspired with an individual referred to as Person 1, as well as other individuals, to participate in a fraud and money laundering scheme in which she would attempt to obtain by fraud pandemic loan funds from the U.S. Small Business Administration ("SBA") and she would assist in laundering other criminally derived funds through business bank accounts.

The defendant is a phlebotomist and, through the years, has been employed in the field at numerous institutions in and around the Philadelphia area. PSR ¶¶ 93, 95-97, 100-01. Although the defendant reported to the Probation Office that she was unemployed due to the COVID-19 pandemic between March 2020 and January 2021, her bank account records from JP Morgan Chase reflect numerous payroll deposits from healthcare institutions during this period. Additionally, the defendant reported that while she applied for Pandemic Unemployment Assistance, she never received the benefits. But the defendant's JP Morgan Chase account records also show that she did, in fact, receive thousands of dollars of unemployment assistance during this same period, March 2020 to January 2021.

Despite being gainfully employed and receiving thousands of dollars of unemployment benefits to which she was not entitled, the defendant seized on the opportunity to work with Person 1 for her own selfish benefit. She tried to obtain a pandemic loan for a fake business that had no operations, and she kept for herself a portion of the funds that she laundered through her accounts at the request of Person 1.

In furtherance of the conspiracy, Dunston registered her fake business in both New Jersey and Pennsylvania. She then opened numerous business bank accounts at several financial institutions. She did so even though she knew that the business in whose name she opened the accounts existed in name only and had never had a bank account. It was not, and had never been, an operational business.

In June 2020, the defendant submitted to the SBA a pandemic loan application in which she sought tens of thousands of dollars in proceeds for her fake business. In the application, she provided false information about the business's revenues and number of employees, claiming ten

employees when it had none, and signed the application under penalty of perjury. The SBA denied the loan.

From June to July 2020, people acting in coordination with Person 1 submitted to the SBA five fraudulent pandemic loan applications in the names of five real businesses with whom they had no affiliation, and without the knowledge or permission of the owners of those businesses. On the applications, the conspirators provided false information about the number of employees, gross receipts, and costs of goods sold for the businesses. The conspirators requested that any loan funds and advances be paid to defendant Dunston's business bank accounts. In July 2020, the SBA approved those loans in a total amount of $750,000 and paid the proceeds to Dunston's bank accounts. As soon as the deposits were made, the defendant worked with Person 1 to move the funds around to make it appear as though the transactions were for legitimate business, and to make the funds difficult to locate. She moved the stolen money around quickly from one business account to another, from business accounts to her personal bank accounts, and out of her business and personal bank accounts to other individuals and accounts in the names of other sham businesses which were controlled by other participants in the conspiracy. Defendant Dunston wrote checks, conducted wire transactions, purchased official bank checks, made purchases, and withdrew cash, all in furtherance of the conspiracy to launder the stolen loan proceeds. Often, she falsely wrote that the payments were for "services," when she knew that the recipients had provided no services to her non-operational business.

## II.    SENTENCING CALCULATION

### A.    Statutory Maximum Sentence

The total maximum sentence is 160 years of imprisonment, three years of supervised release, a $1,499,000 fine, which is twice the value of the funds involved in the transactions, and

an $800 special assessment. Full restitution shall also be ordered, which in this case is a total of $451,095.81.[1] Forfeiture may also be ordered.[2]

### B.    Sentencing Guidelines Calculation

The Probation Office correctly calculated the defendant's advisory guideline range in the revised final Presentence Report ("PSR") issued on April 9, 2026. This calculation is as follows:

| | |
|---|---|
| Base offense level (§ 2S1.1, § 2B1.1(b)(1)(G)): | 22 |
| Convicted under 18 U.S.C. § 1956 (§ 2S1.1(b)(2)(B)): | +2 |
| Sophisticated laundering (§ 2S1.1(b)(3)): | +2 |
| Zero-point offender (§ 4C1.1): | -2 |
| Acceptance of responsibility (§ 3E1.1): | -3 |
| **Total offense level:** | **21** |

The defendant has not objected to the calculation set forth above. The defendant has a criminal history score of zero. Accordingly, the guideline range is 37 to 46 months of incarceration.

## III.    ANALYSIS

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United*

---

[1] The total of the five pandemic loan proceeds deposited to the defendant's accounts was $749,500 (a loan processing fee of $100 was charged for each of the $150,000 loans). The SBA recovered the $149,900 deposit to Dunston's account for the proceeds of the loan in the name of Victim Business 1. PSR ¶ 18 n.6. The SBA also recovered $148,504.19 of the deposit to Dunston's account for the proceeds of the loan in the name of Victim Business 2. PSR ¶ 19 n.7. Therefore, restitution was calculated as follows: $749,500 - $149,900 - $148,504.19 = $451,095.81. The defendant has not made any objection to the restitution calculation.

[2] In a separate motion, the government is seeking a forfeiture money judgment in the amount of $25,333.81, which is the amount of the dirty money that the defendant kept for herself, spent herself, and converted to untraceable cash.

*States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id*. at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### A.       Consideration of the 3553(a) Factors Regarding Imprisonment

Defendant Dunston engaged in a serious offense in which she acted in concert with others in a large, sophisticated conspiracy. Generally speaking, crimes committed through conspiracy are more significant than crimes committed by a single individual because, through the coordinated conduct of many participants, the conspiracy is capable of being more profitable, more difficult to detect, and harder to terminate. The conspiracy that the defendant participated in was a textbook example of such a conspiracy. Certain actors committed the cybercrime of submitting fraudulent loan applications. These actors were separate from those like the defendant who participated in

moving stolen funds around once received, so the cyber actors were able to concentrate continuously on stealing. While that was occurring, Person 1 recruited willing participants like the defendant to open numerous business bank accounts to receive the stolen victim funds. As soon as the victim funds arrived in the conspirators' accounts, Person 1 and others coordinated with launderers like the defendant to conduct immediate transfers of that money in ways designed to avoid detection, tracing, and freezing. Specifically, the participants broke up the stolen funds into smaller transaction amounts, caused conspirators to send funds in multiple directions and in multiple layers (for example, to other conspirators and to their own accounts at other banks, and then back again in different amounts), and converted the stolen funds into cash and other difficult-to-trace financial instruments, such as cashier's checks. Because Person 1 had recruited multiple participants like the defendant, and each participant, like the defendant, had opened accounts at multiple banks, the web of transactions was complex. If a launderer had one account frozen by a bank due to suspected fraud, that person had many other accounts that could spring into action so that the person could continue to aid the conspirators. No one launderer held all of the stolen funds at once, so if the banks closed all of the accounts held by one launderer, the laundering conspiracy could continue to operate through others.

Throughout the course of the scheme, the defendant committed a variety of affirmative acts to assist the conspiracy, including opening bank accounts and conducting numerous financial transactions. Perhaps most troubling are the defendant's numerous lies in furtherance of the crimes. She lied on her own pandemic loan application about having an operating business with employees. She lied about the purpose of checks that she wrote when moving the dirty money around. And when Citizens Bank froze her accounts, the defendant called the bank to try to free up the funds in the account and lied again. In a recorded call, the defendant told the bank employee

that the funds deposited to her account were from investors who were now calling her and complaining, and that various withdrawals from her accounts were for vendors and employees, all of which was false.

The fact that the defendant does not have a prior criminal history does not weigh in favor of a below-Guidelines sentence. Rather, this fact is accounted for in the Guidelines range, because she is in the lowest criminal history category and received the two-level reduction in her offense level for being a zero-point offender.

The defendant's history of drug use and spotty employment due to unreliability suggests that she is at risk for recidivism. The crime the defendant committed was one of greed and opportunity. For that reason, there is a need for the sentence in this case to send a message of deterrence to this defendant.

A sentence within the Guidelines range would also promote respect for the law and provide just punishment for the offense. The loan fraud and money laundering scheme in which the defendant participated caused real harm to the government and siphoned money away from the small businesses which were legitimately qualified for pandemic loans. It succeeded on a large scale because it was organized, roles were compartmentalized, and people like the defendant were willing to risk conducting laundering transactions in their own names in order to make quick money. These types of schemes are an epidemic in the United States and cannot succeed without people like the defendant laundering the funds. According to the 2026 INTERPOL Global Financial Fraud Threat Assessment, financial fraud is among the top five global crime threats, has caused a steady increase in fraud loss in the United States from $4 billion in 2020 to $16.6 billion

in 2024, and is expected to escalate significantly in the next three to five years.[3] Financial frauds can destroy businesses and steal significant resources from governmental entities. *See*, *e.g.*, *United States v. Carver*, 916 F.3d 398, 404 (4th Cir. 2019) ("Financial fraud is a modern scourge. It preys especially upon the unsophisticated and vulnerable" and "harm[s] victims in almost irreparable ways by causing them loss of work, mental anguish, monetary loss, and loss of peace of mind."). In addition to sending a message of deterrence to defendant Dunston, there is also a need for this sentence to send a message of general deterrence to those who might be tempted to do the same. It is important to send a message that people who steal and launder money will face serious consequences. *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (internal quotations omitted). The recommended sentence of incarceration affords adequate deterrence to others who would commit a similar offense and protects the public from further crimes of the defendant, for at least as long as she remains incarcerated.

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." U.S.S.G. § 3553(a)(2)(D).

Adherence to the recommended guideline range assures that the defendant's sentence is consistent with those imposed nationwide for similarly situated offenders and thus complies with Section 3553(a)(6) and avoids undue disparity. The Guidelines represent the distillation of more than 20 years of careful study of sentencing practices across the country and correlate as well to

---

[3] The report is available at: https://www.interpol.int/News-and-Events/News/2026/INTERPOL-report-warns-of-increasingly-sophisticated-global-financial-fraud-threat.

the varying severity of crimes as defined by Congress. Indeed, "the Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). Here, the properly calculated Guidelines range accurately accounts for the financial harm and sophistication of the scheme while also taking into account the defendant's acceptance and lack of criminal history. A sentence within the Guidelines range will avoid unwarranted disparities with similarly situated defendants nationwide who have committed similar crimes.

While this Court has sentenced other conspirators in this scheme to below-Guidelines sentences, against the requests of the government, the circumstances of those defendants were significantly distinguishable from the circumstances here. Unlike defendant Carine (Crim. Case No. 25-39), defendant Dunston has no history of military service to the United States and close family members attesting to her dramatic turnaround in the years since the offense. Defendant McCrea (Crim. Case No. 25-387) had a lengthy pattern of volunteer work with vulnerable populations. Additionally, her close family members attested to her long history of honesty and taking care of others, and to her criminal conduct as being completely out-of-character. Those circumstances are not present in this case.

People who perpetrate financial crimes, especially highly organized and sophisticated financial crimes such as those at issue here, do pay attention to enforcement actions and trends. According to the 2026 INTERPOL Global Financial Fraud Threat Assessment, criminal networks are cooperating globally, sharing expertise, and adapting their illicit business models to optimize efficiency, "including through collaboration with specialized money laundering networks," and the offenders are "highly organized, skilled and agile." INTERPOL Report at 6. In the face of the

epidemic of financial crimes nationwide and internationally, the government asks the Court to consider its deterrence message in fashioning the appropriate sentence in this case.

At the same time, defendant Dunston has not presented a persuasive case for leniency. She has never expressed any remorse for her crimes.

Therefore, in sum, all of the appropriate considerations of sentencing favor the imposition in this case of a within-guideline sentence. As noted, the Sentencing Guidelines present "the lodestone of sentencing," *Peugh*, 569 U.S. at 544, and that guide is once again persuasive in this case.

**B.    Supervised Release**

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further, Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

11

In this case, a term of supervised release of three years is warranted. As noted above, it is the government's position that the defendant presents a serious risk of recidivism, as the opportunity and temptation to commit a similar crime may present itself in the future. Moreover, the defendant has admitted to long-term illegal drug use, a costly habit that often leads people to commit financial crimes in order to afford the illegal drugs. Notably, the defendant has tested positive for illegal drug use while on pretrial release in this case, indicating further risk of recidivism. PSR ¶ 87. Supervision after incarceration will advance the goals of deterring criminal conduct, § 3553(a)(2)(B), protecting the public, § 3553(a)(2)(C), assuring that the defendant continues to pursue efforts that promote rehabilitation, § 3553(a)(2)(D), and pays restitution to victims, § 3553(a)(7). The Sentencing Commission has added, "In a case in which a defendant sentenced to imprisonment is an abuser of controlled substances or alcohol, it is highly recommended that a term of supervised release also be imposed." § 5D1.1 app. note 3.

For these reasons, the government recommends a term of supervised release of three years and imposition of all of the mandatory and standard conditions of supervised release listed in Section 5D1.3.

## IV.     CONCLUSION

Unless otherwise presented at the defendant's sentencing hearing and stated in the sealed attachment to this memorandum, the government believes that a sentence within the advisory

guideline range of 37 to 46 months of incarceration and a three-year term of supervised release is appropriate in this case.

Respectfully submitted,

DAVID METCALF
United States Attorney

*s/ Nancy E. Potts*
NANCY E. POTTS
Assistant United States Attorney

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a copy of the foregoing was filed electronically and was served by electronic mail upon:

> Arnold Joseph, Esq.
> 1801 Market Street, Suite 2500
> Philadelphia, PA 19103
> acjoseph8@gmail.com

Date: April 13, 2026                 *s/ Nancy E. Potts*
                                     NANCY E. POTTS